AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Indiana



In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

1434 Iron Trail W. Indianapolis, Indiana, more fully
described in Attachment A.

)
)
)
)
)
)

Case No.  1:20-mj-0115

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
1434 Iron Trail W. Indianapolis, Indiana, more fully described in Attachment A.

located in the _____Southern_____ District of _____Indiana_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1) & 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Todd J. Bevington, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    02/06/2020

_____
*Judge's signature*

City and state:  Indianapolis, IN

Doris L. Pryor, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Todd J. Bevington, being duly sworn under oath, states as follows:

## **TRAINING AND EXPERIENCE**

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice.  I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been employed with the ATF since December of 2013, and I am currently assigned to the Indianapolis Field Office, Crime Gun Intelligence Center (CGIC).  Prior to my employment with the ATF, I was employed as a police officer and detective with the Richmond, Virginia, Police Department for over thirteen years. I spent approximately ten of those years assigned to various firearm and narcotics enforcement units, including over seven years with the Special Investigations Division-Narcotics Unit, Major Cases Team. I was also assigned as a Task Force Officer (TFO) to the Federal Bureau of Investigation (FBI)-Safe Streets Task Force. In connection with my official law enforcement duties, I investigate criminal violations of state and federal firearms and narcotics laws, including but not limited to, Title 18, United States Code, Sections 922 and 924; I also investigate criminal violations of money laundering laws, including Title 18, United States Code, Sections 1956 and 1957.  I have received special training in the enforcement of laws concerning controlled substances from the Drug Enforcement Administration (DEA), the Virginia Department of Criminal Justice Services (DCJS), and the Richmond Police Department and the Federal Law Enforcement Training Center (FLETC).  I have testified in judicial proceedings and prosecutions for violations of firearms and controlled substances laws.  I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses and

1

informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealing of proceeds from drug trafficking. I have participated in investigations involving the manufacturing, trafficking, and distribution of illegal narcotics. I have utilized, and am therefore familiar with, the following investigative techniques: consensual and court-ordered electronic surveillance, physical surveillance, pole or other camera surveillance, trash covers, the development and operation of informants and cooperating defendants, the execution of search warrants, consent searches, undercover agent operation, Global Positioning Systems (GPS), parcel package drug interdiction, motel drug interdiction, highway drug interdiction, and the debriefing of defendants, witnesses, informants, and others who have knowledge of drug trafficking and of the laundering and concealing of proceeds from drug trafficking. I have received specialized training in the utilization of these investigative techniques, and have also received specialized training regarding the investigation of criminal gangs and other criminal enterprises.

3.     I have participated in federal electronic wiretap investigations regarding individuals involved in the trafficking and distribution of controlled substances. I am familiar with the ways in which narcotics traffickers conduct their illicit business, including, but not limited to, their methods of importing and distributing controlled substances, as well as their use of telephones and coded language to conduct their transactions.

4.     I know from my training and experience that individuals involved in the trafficking of controlled substances often maintain possession and control of firearms in attempt to protect themselves and their illegal controlled substances enterprise (that is, both their drugs and drug proceeds). Furthermore, drug traffickers will utilize those firearms as a means to intimidate or ensure the loyalty of their associates and/or subordinates and to prevent those with intimate knowledge of the organization from disclosing information to law enforcement.

## PURPOSE OF THE AFFIDAVIT

5.     This affidavit is being submitted in support of the application to search the following location:  the residence located at 1434 Iron Trail West, Indianapolis, Indiana (the primary residence of Mona JOHNSON, further described in Attachment A).

6.     The facts set forth in this Affidavit are based on my personal participation in this investigation and from information provided by detectives, federal agents, federal task force officers, and police officers from various law enforcement agencies, collectively referred to as the "investigators."  I am also incorporating my experience, training, and background as a law enforcement officer and ATF Special Agent.  Because this Affidavit is being submitted solely for establishing probable cause to secure authorization for search warrants, I have not included each fact known to me concerning this investigation.

## THE INVESTIGATION

7.     On December 2, 2019, officers with the Fishers, Indiana, Police Department conducted a traffic stop on a 2012 Gray Dodge Charger (hereinafter the Charger) registered to Tyree Johnson. Tymani JOHNSON[1] was the front seat passenger.  Officers recovered approximately fourteen grams of marijuana, a loaded Glock pistol, $10,400.00 of currency, and five (5) cellular telephones, which included a phone recovered from JOHNSON.

8.     A computerized criminal history check on Tymani JOHNSON showed he had sustained felony convictions in Marion County, Indiana, to include: maintaining a common nuisance-controlled substances, under cause #49G20-1703-F6-009603, and possession of a narcotic drug, under cause

---

[1]     During the traffic stop/arrest, Tymani JOHNSON used the name/identifiers of Tyree Johnson (his brother). JOHNSON was ultimately booked under Tyree's name into the Hamilton County Jail and released from custody. JOHNSON's true identity was later confirmed by JOHNSON's fingerprints taken by the jail.  At the time of the arrest on 12/2/2019, JOHNSON was a convicted felon and had an active warrant (49G20-1611-F5-044498) for illegal handgun possession and multiple narcotics offenses.

#49G20-1611-F5-044498.  JOHNSON had also been previously arrested for dangerous possession of a firearm.  Based on JOHNSON's criminal history, JOHNSON is prohibited from possessing firearms.

9.      Investigators obtained court authorization to search JOHNSON's cell phone for evidence of marijuana trafficking. Upon reviewing the data in JOHNSON's phone, investigators observed the following: videos/images of large quantities of suspected marijuana and currency, videos/images of firearms (including the Glock pistol recovered during the traffic stop), a Smith &Wesson pistol that was reported stolen to law enforcement, videos/images of a utility bill for 2322 North Goodlet Avenue, videos/images of JOHNSON and the Charger parked outside 2322 North Goodlet Avenue, and SMS between JOHNSON and his narcotics customer(s)[2], as set forth in greater detail below.

10.      For example, on October 9, 2019, JOHNSON received an SMS from "TattMan" asking, "What about rollers (MDMA)", "Mfs asking about them." JOHNSON replied, "I ain't got em." Tattman replied, "Awe damn what bout barz (Xanax)?"  JOHNSON replied, "Got em."

11.      On October 18, 2019, JOHNSON received an SMS from "Chris" asking "Youbat the spot i need a zip (that is, "Chris" was asking JOHNSON if JOHNSON was at 2322 North Goodlet Avenue because "Chris" needed an ounce of a controlled substance)."  JOHNSON replied, "yea."  "Good gas in 150 & 175 zips (this is, JOHNSON was telling "Chris" that JOHNSON had high quality marijuana for sale for $150.00 and $175.00 per ounce)."

12.      On October 22, 2019, JOHNSON received an SMS from "Dt" asking "What u letting them oz go for? (This is, "Dt" was asking JOHNSON how much JOHNSON was charging for ounces of a controlled substance, presumably marijuana)."  JOHNSON replied, "180 & 200."

---

2      Summaries of selected pertinent SMS conversations from JOHNSON's phone provided by ATF Special Agent Todd J. Bevington are set forth in this Affidavit.  All information in parentheses is an interpretation of the SMS being described.

13.     On October 26, 2019, JOHNSON sent "RubenUnc" an SMS that said, "Exotics (high grade marijuana)." "RubenUnc" replied, "Bet can glide thru" (that is, RubenUnc was asking JOHNSON if "RubenUnc" could come to 2322 North Goodlet Avenue to purchase marijuana from JOHNSON)." JOHNSON replied "Yea.

14.     Beginning in late January 2020, investigators began conducting surveillance(s) on the residence of 2322 North Goodlet Avenue (hereinafter the Goodlet residence).  During these surveillance(s), investigators observed activity consistent with narcotics trafficking occurring from the residence.  Investigators observed vehicle(s) arrive at the residence, the occupant(s) of the vehicle(s) would enter the front door of the residence, and they would depart a short time later.  Investigators further observed the Charger parked in the driveway of the residence during all times of the day and night. JOHNSON was also observed entering and exiting the residence on numerous occasions, and he appeared to have unrestricted access to the residence.

15.     On January 29, 2020, investigators were conducting surveillance on the Goodlet residence. Investigators observed a male known as Royeon Spells arrive at the residence in a vehicle.  Investigators knew Spells was wanted on an outstanding felony warrant.  Spells exited the residence a short time later and was surveilled to a nearby gas station where Spells engaged in what appeared to be a "hand to hand" drug transaction with an unidentified individual.  After Spells left the gas station, investigators attempted to conduct a traffic stop on Spells.  Spells refused to pullover and led investigators on a vehicle pursuit that lasted for several miles.  The pursuit ended after Spells crashed into a residence and fled the scene on foot.  Spells was subsequently arrested and a distribution quantity of marijuana along with a digital scale were recovered from Spells' vehicle.

16.     Investigators maintained surveillance on the Goodlet residence during the vehicle pursuit of Spells.  Shortly after Spells' arrest, investigators observed JOHNSON run from the residence, carrying

a backpack and driving away in the Charger. Investigators were unable to maintain surveillance on JOHNSON.

17. On or about the late evening of January 29, 2020, Indianapolis Metropolitan Police Department (IMPD) officers attempted to stop the Charger after witnessing a traffic infraction. The Charger refused to stop and led officers on a vehicle pursuit that lasted several miles. After the pursuit ended, officers arrested the driver who identified himself as "Tyree Johnson". Officers learned that Tyree Johnson was in fact Tymani JOHNSON who was falsely identifying himself by his brother's name. JOHNSON was arrested on his outstanding warrants and was charged with felony resisting law enforcement. JOHNSON was transported to the Marion County Jail.

18. Since JOHNSON's arrest, investigators have been monitoring JOHNSON's recorded telephone calls from the Marion County Jail. As set forth in greater detail below, investigators believe JOHNSON was directing his mother and other individuals to recover firearms and controlled substances from the Goodlet residence.[3]

19. On January 30, 2020, JOHNSON called an unidentified female and instructed her to "three way" a male identified by JOHNSON as "Dre". During this call, "Dre" stated, "...that Glock on the bed." JOHNSON replied, "Yeah." "Dre" asked, "Where's it at?" JOHNSON replied, "In my closet." "Dre" replied, "Alright, bet, cause they came, he kept asking. I told your momma to come get this [inaudible] too though...you hear me?" JOHNSON replied, "Just tell her to go come get all, just tell her to go get all, just tell her to go get all my shit... I don't know when I'm gonna get out, just tell her go get my clothes

---

[3]       Summaries of selected pertinent conversations between JOHNSON and other individuals provided by ATF Special Agent Todd J. Bevington are set forth below. Although every effort has been made to ensure the accuracy of the summaries, including voice identifications made with respect to the call summaries, all summaries and voice identifications contained herein are tentative and subject to revision. Similarly, all summaries and opinions contained herein are in draft form and may be revised after further review of the audio recording. Upon request, the Government will make all of the recordings and draft transcripts available to the Court for its own review. All information in parentheses is an interpretation of the calls being described.

and go get, not just go get what's its name, just get the umm, leave like, leave like one, leave like one and one there and take everything else out." " Dre" replied, "Alright." JOHNSON asked, "You know what I mean by one and one?" "Dre" replied, "Yeah, I got you!" (This is, JOHNSON was telling "Dre" to tell JOHNSON's mother to recover his belongings from the Goodlet residence; including controlled substances and one firearm, but JOHNSON wanted his mother to leave one firearm inside the Goodlet residence.)

20.    Investigators were able to identify JOHNSON's mother as MONA JOHNSON (hereinafter MONA). A computerized criminal history check on MONA showed she has sustained felony conviction for possession of a narcotic drug, on or about April 25, 2000. ~~JOHNSON~~ had also been previously arrested for battery resulting in bodily injury, criminal recklessness and alteration of a handgun. Based on the criminal history check, MONA is prohibited from possessing firearms.

21.    On February 2, 2020, JOHNSON called MONA. During this call, JOHNSON told MONA, "You should, you should just go get my stuff." MONA replied, "I am, I am." JOHNSON said, "Everything, leave like, leave probably, um one, one umm, little thing to protect them. You feel me?" (This is, JOHNSON was telling MONA to recover his belongings from the Goodlet residence but to leave one firearm for the other individuals residing at the residence). MONA replied, "Yeah but I'm going to get it." JOHNSON stated, "I told you I had two motorcycles (firearms) right?" MONA replied, "Yeah, but he acting like it was nothing there. That what Eric said...but one." JOHNSON replied, "Naw, he trippin! Go get my stuff momma! Go on in there, there's one in the closet; should be one under the bed or something...and it's a regular, ummm, just a hand (gun)..." MONA replied, "Don't worry about it, I'm going over there." Later in the call, JOHNSON stated, "...and then get all my stuff. There's suppose to be like a candy, umm, you know, the little thing I be carrying around that say, umm, white runtz on it. It's

like a candy package thing, the stuff that I be smoking out of." (This is, JOHNSON was telling MONA to also retrieve his high-grade marijuana from the Goodlet residence).

22.     During a later call on February 2, 2020, MONA told JOHNSON, "I'm good. I done situated the stuff at my house." JOHNSON laughed, "You are so crazy." MONA replied, "I'm, I'm, some of that stuff, one of them bags, the orange bag, one of the bags seemed like it was lower than the other ones." JOHNSON replied, "Yeah, cause one of them I had got back from Roy, cause umm, when everything happened." MONA replied, "Oh." JOHNSON asked, "How many of 'em was it? Was it three?" MONA replied, "Yeah, but one of them was low." JOHNSON asked "Low, low?" MONA replied, "Not low, low, but it was low… Oh, but I took some of the other stuff that was there." JOHNSON replied, "And Eric said umm, you got the candy bag stuff I told you to get?" MONA replied, "The, the other, I got the, I just got the duffle bag." JOHNSON stated, "I'm saying did you get the candy bag thing, it say white, the first word on it say white." MONA replied, "Yeah, I got that. Yeah!" JOHNSON stated, "Put that up for me! Put that up, hide that up!" MONA replied, "I got everything put up in here, I'm not giving nobody nothing!" Later in this call, MONA asked, "Did you want me to take all the motorcycles (firearms)?" JOHNSON replied, "Yeah, I was saying, I don't really trust them like that…and yeah, we don't need nothing in there no more because, umm, there ain't really nothing shaking…" (This is, MONA was confirming with JOHNSON that she was supposed to take all the firearms from the Goodlet residence. JOHNSON affirmed this and stated that occupants of the Goodlet residence no longer needed a firearm for protection since MONA had removed most of the controlled substances from the house).

23.     Investigators queried MONA (JOHNSON) through various law enforcement/open source databases, including the Indiana Bureau of Motor Vehicles (BMV), and learned MONA provided 1434 Iron Trail West (hereinafter the Iron Trail residence), Indianapolis, Indiana, as her "primary" residence on numerous occasions in the past. Further, MONA's employer confirmed that MONA provided the Iron

Trail residence to them. Investigators contacted the arresting officer from JOHNSON's December 2019 arrest. During this arrest, the officer stated he asked JOHNSON for an address to send forfeiture paperwork for the currency seized from JOHNSON. JOHNSON provided the officer with the Iron Trail address. Investigators have conducted surveillance on the Iron Trail residence and have observed MONA's vehicle parked in front of the residence. Finally, investigators have observed the Charger parked in front of the residence since JOHNSON's arrest. Investigators learned IMPD officers relinquished custody of the Charger to MONA after JOHNSON's arrest on or about January 29, 2020.

24.     Based on the information provided in this Affidavit, there is probable cause to believe Tymani JOHNSON was utilizing the residence of 2322 North Goodlet Avenue, Indianapolis, Indiana, to store firearms, store controlled substances, and distribute controlled substances prior to his arrest on January 29, 2020. Since JOHNSON's arrest, there is probable cause to believe Mona JOHNSON retrieved firearms and quantities of controlled substances from the Goodlet residence. There is probable cause to believe these items are presently stored inside Mona JOHNSON's residence located at 1434 Iron Trail West, Indianapolis, Indiana. Both of these residences are located within the Southern District of Indiana.

## **REQUESTS FOR SEARCH WARRANTS**

25.     I am requesting search warrants for the following location: the residence located at 1434 Iron Trail West, Indianapolis, Indiana (the primary residence of Mona JOHNSON, further described in Attachment A).

### Characteristics of Residential Searches

26.     In a substantial number of residential searches executed in connection with the drug and firearms investigations in which the ATF has participated, the following kind of drug-related evidence have typically been recovered:

      a.   Currency, currency wrappers, and devices used to count currency;

b. Drugs or money ledgers, drugs distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

c. Drug paraphernalia, such as scales, wrapping paper, plastic bags, and packing materials, and diluting agents such as Vitamin B12 and inositol;

d. Financial instruments, precious metals, jewelry, other items of value, proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending sums of money derived from drug trafficking activities;

e. Articles of personal property and documents generated during their time trafficking drugs that establish and document the acquisition, movement, and spending of large sums of money generated from drug trafficking activities including: the purchase of real estate and conveyances, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds, ledger books, financial instruments purchased with large amounts of currency derived from the sale of heroin or other controlled substances, including wire transfers, traveler's checks, stock certificates, money orders, cashier's checks, and certificates of deposit, securities, letters of credit, and brokerage houses.  Documents pertaining to foreign and domestic bank accounts and their attendant generated from the sale of controlled substances;

f. All state and federal income tax returns, whether individual or corporate returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, or any other documents showing the employment or business history, whether or not such employment or business may be fictitious;

10

g.  Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes and documents, and other items, and reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

h.  Photographs and rolls of film;

i.  Records of off-site locations to store records, including safe deposit boxes, rental agreements for storage facilities, and other such records and receipts;

j.  Records and documents pertaining to assumed named aliases, including driver's licenses, passports;

k.  Records or documents evidencing travel within or outside of the State of Indiana, within or outside the United States, including passports, airline records, bus and train tickets, hotel records, and car rental records;

l.  Indicia of occupancy, residency, or ownership and control of the premises and other, off-site locations, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, settlement statements, addressed envelopes, escrow documents, and keys;

m.  Records of mail and communications services, telephone pagers, answering machines, electronic pagers, and cellular telephones, which evidence participation in a conspiracy to distribute controlled substances;

n.  Cellular telephones, telephone pagers, electronic pagers, answering machines (including information contained within these devices, such as the telephone number, and/or name and identity assigned to the phone; digital, cellular and/or telephone numbers, and/or names and identities stored in the directory; telephone numbers dialed

from or received by the phone and stored in memory; stored voice mail recordings sent

to the phone; stored text messages sent to, or sent from, the phone; stored photographs

and videos; and any other electronic mail or any other electronic data stored within the

phone and/or the memory of the phone);

o. As used above, the terms records, documents, programs, applications or materials

includes records, documents, programs, applications or materials created, modified or

stored in any form;

p. Any computer equipment and storage device (such as a DVR or media storage device)

capable of being used to commit, further or store evidence of the offense listed above;

q. Any computer equipment used to facilitate the transmission, creation, display,

encoding or storage of data, including word processing equipment, modems, docking

stations, monitors, printers, plotters, encryption devices, and optical scanners;

r.   Firearms, ammunition and other dangerous weapons;

s. Any and all evidence of false and/or fictitious identification documents, to include, but

not limited to, any state, federal, or international drivers' licenses, birth certificates,

passports, identification cards, credit cards or any other document utilized to conceal

one's true identity; and

t. Controlled substances.

27.  Based on my training and experience, I am aware that drug traffickers generally store their

drug-related paraphernalia in their residences or the curtilage of their residences (to include unattached

out buildings), or in vehicles that are parked on the curtilage of their residences.  Further, drug traffickers

generally maintain records relating to their drug trafficking activities in their residences or the curtilage

of their residences.  Because drug traffickers often "front" (that is, sell on consignment) controlled

substance to their customers, or alternatively, will be "fronted" controlled substances from their suppliers, such record keeping becomes necessary to keep track of amounts paid and owed, and drug traffickers typically maintain these records close at hand to readily ascertain current balances. Often, drug traffickers keep "pay and owe" records to show balances due for drug payments in the past ("pay") and for payments expected ("owe") to and from the trafficker's supplier and the trafficker's dealers. Additionally, drug traffickers typically maintain telephone and address listings of customers and suppliers and keep them immediately available so that they can efficiently conduct their drug trafficking business.

28.     It is also a common practice for traffickers to conceal large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances, at their residences. In this connection, drug traffickers typically use wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also typically maintain evidence of such financial transactions and records relating to income and expenditure of money at their residences or the cartilage of their residence.

29.     Typically, drug traffickers possess firearms and other dangerous weapons at their residences to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the trafficker's profits or supply of drugs.

30.     I know that computer hardware, software and electronic files may be important to a criminal investigation because the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software and electronic files that are evidence of crime, contraband, instrumentalities of crime, and or fruits of crime. In this case, the warrant application requests permission to search and seize records and documents relating to the trafficking of the substances identified in this investigation. These records constitute evidence of crime. This affidavit also requests

permission to seize the computer hardware that may contain these records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search offsite. This affiant believes that, in this case, the computer hardware is a container for evidence and also an instrumentality of the crimes under investigation.

31.     Based on my knowledge, training and experience, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a.   The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.   Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to record even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or

14

destruction, a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

32.     In light of these concerns, I request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agent executing the search concludes that it would be impractical to search the computer hardware on-site for this evidence.

33.     I know that cellular telephones may be important to a criminal investigation because cellular telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crimes in the form of electronic data. In this case, the warrant application requests permission to search and seize records relating to the trafficking of the substances identified in this investigation. These records constitute evidence of crime. I also request permission to seize the cellular telephones that may contain these records and search the memory of the cellular telephones. I believe that, in this case, cellular telephones (including saved voice mails and text messages) are a container for evidence and instrumentalities of the crimes under investigation.

34.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arises from the following: my involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement in a number of accessions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents have advised me when relating the

substance of their similar debriefings and the results of their own drug investigations; and other intelligence information provided through law enforcement channels.

35.    In a number of residential searches in prior investigations that I have been involved in, the types of evidence identified in Attachment "B" have typically been recovered from the main residence and from other structures and areas on the properties being searched, for example, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence (including vehicles that are maintained and stored on the curtilage of a main residence).

## CONCLUSION

36.    The government requests the Court to maintain this Affidavit and all related documents remain under seal until further order of the Court.  Disclosing the contents of this Affidavit could alert other targets of this investigation to the existence of the ATF investigation in this matter.  As a result, the targets may flee the jurisdiction and destroy evidence that the ATF might otherwise obtain during the course of the ongoing investigation.

37.    WHEREFORE, based upon the information contained in this Affidavit, probable cause exists to believe that the articles identified on Attachment "B" are present at the premises to be searched.

Todd J. Bevington, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and subscribed to me this
6th day of February, 2020

Doris L. Pryor
Magistrate Judge
Southern District of Indiana

16

## ATTACHMENT A

## DESCRIPTION OF RESIDENCE TO BE SEARCHED

The residence is located at 1434 Iron Trail W. Indianapolis, Indiana in the West Glen Village housing addition. The residence is located on the west side of Iron Trail West and is the 2nd structure south of Rushmore North. The residence is described as a single story single family residence. The residence has light gray colored siding, blue window shutters, and white trim exterior. The residence has a dark gray colored shingled roof. The numbers "1434" are vertically affixed in black lettering to the south/east corner vertical trim piece of the residence.





## ATTACHMENT B

Items reflecting evidence of distribution of controlled substances and conspiracy to so distribute, in violation of Title 21, United States Code, Sections 841 and 846, and felon in possession of a firearm/ammunition, in violation of Title 18, United States Code, Section 922(g)(1) to wit:

     a.     Currency, currency wrappers, and devices used to count currency;

     b.     Drugs or money ledgers, drugs distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

     c.     Drug paraphernalia, such as scales, wrapping paper, plastic bags, and packing materials, and diluting agents, such as methylsulfonylmethane, commonly known as MSM;

     d.     Financial instruments, precious metals, jewelry, other items of value, proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending sums of money derived from drug trafficking activities;

     e.     Articles of personal property and documents generated during their time trafficking drugs that establish and document the acquisition, movement, and spending of large sums of money generated from drug trafficking activities including: the purchase of real estate and conveyances, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds, ledger books, financial instruments purchased with large amounts of currency derived from the sale of heroin or other controlled substances, including wire transfers, traveler's checks, stock certificates, money orders, cashier's checks, and certificates of deposit, securities, letters of credit, and brokerage houses. Documents pertaining to foreign and domestic bank accounts and their attendant generated from the sale of controlled substances;

     f.     All state and federal income tax returns, whether individual or corporate returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, or any other documents showing the employment or business history, whether or not such employment or business may be fictitious;

g.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes and documents, and other items, and reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

h.      Photographs and rolls of film;

i.      Records of off-site locations to store records, including safe deposit boxes, rental agreements for storage facilities, and other such records and receipts;

j.      Records and documents pertaining to assumed named aliases, including driver's licenses, passports;

k.      Records or documents evidencing travel within or outside of the State of Indiana, within or outside the United States, including passports, airline records, bus and train tickets, hotel records, and car rental records;

l.      Indicia of occupancy, residency, or ownership and control of the premises and other, off-site locations, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, settlement statements, addressed envelopes, escrow documents, and keys;

m.      Records of mail and communications services, telephone pagers, answering machines, electronic pagers, and cellular telephones, which evidence participation in a conspiracy to distribute controlled substances;

n.      Cellular telephones, telephone pagers, electronic pagers, answering machines (including information contained within these devices, such as the telephone number, and/or name and identity assigned to the phone; digital, cellular and/or telephone numbers, and/or names and identities stored in the directory; telephone numbers dialed from or received by the phone and stored in memory; stored voice mail recordings sent to the phone; stored text messages sent to, or sent from, the phone; stored photographs and videos; and any other electronic mail or any other electronic data stored within the phone and/or the memory of the phone);

o.      As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form;

p.  Any computer equipment and storage device (such as a DVR or media storage device) capable of being used to commit, further or store evidence of the offense listed above;

q.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

r.  Firearms, ammunition and other dangerous weapons;

s.  Any and all evidence of false and/or fictitious identification documents, to include, but not limited to, any state, federal, or international drivers licenses, birth certificates, passports, identification cards, credit cards or any other document utilized to conceal one's true identity; and

t.  Controlled substances.